# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| POLAR PRO FILTERS INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-19-1706 |
| | § | |
| FROGSLAYER, LLC, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND OPINION

Polar Pro Filters Inc. sued FrogSlayer, LLC, alleging that FrogSlayer failed to work on a video-editing computer program within the time and budget set out in the parties' October 2017 Software Consulting Agreement. (Docket Entry No. 1). Polar Pro asserts claims for contract breach, negligent misrepresentation, fraud, and violations of the Texas Deceptive Trade Practices Act. (*Id.*).

FrogSlayer moved to dismiss for failure to state a claim, arguing that Polar Pro's allegations are facially implausible and do not meet the federal pleading standard for fraud. (Docket Entry No. 19). Polar Pro replied, arguing that FrogSlayer's motion is untimely and that the complaint sufficiently raises the claims, and FrogSlayer replied. (Docket Entry Nos. 22, 23).

Based on the pleadings, the motions and responses, and the applicable law, the court: (1) grants FrogSlayer's motion to dismiss the fraud-based claims relating to statements made before the parties entered the Agreement, about FrogSlayer's ability to do the work, and the statement made later about the software's functionalities, without prejudice; (2) denies the motion to dismiss the fraud-based claims relating to FrogSlayer CEO Ross Morel's statements and contract-breach

claim; and (3) grants Polar Pro leave to amend, no later than **November 11, 2019**. The reasons are explained below.

I. **Background**

The background is drawn from Polar Pro's complaint and the documents referred to and central to the complaint. *Brand Coupon Network, L.L.C. v. Catalina Mktg. Corp.*, 748 F.3d 631, 635 (5th Cir. 2014).

Polar Pro develops and sells camera software for various devices, including drones and cellphones. (Docket Entry No. 1 at ¶ 6). In August 2017, Polar Pro contacted FrogSlayer, a software developer, about "the possibility of developing a proprietary, computer-based video editing program." (*Id.* at ¶¶ 7–8). FrogSlayer represented that it had experience in video-editing and media management. (*Id.* at ¶ 9). On August 29, after "preliminary market research," FrogSlayer employees told Polar Pro that "there's a good opportunity, and need, in this space" and that "we really think this is a project we can knock out of the park." (*Id.* at ¶ 10). Polar Pro allegedly told FrogSlayer that it liked the "design and style" of Apple's iMovie and some of the features of Adobe's Premiere Pro. (*Id.* at ¶ 11). Polar Pro and FrogSlayer discussed the program's specifications and features throughout September 2017. (*Id.* at ¶ 12). On October 7, they "entered into a Software Consulting Agreement where FrogSlayer agreed to provide consulting and software development services described in Statements of Work." (*Id.* at ¶ 13; Docket Entry No. 19-1).

FrogSlayer sent Polar Pro a "Project Charter" on December 13, 2017, naming the project "The Ripper," and detailing "approximately eight months of work for a total cost of $262,520." (Docket Entry No. 1 at ¶¶ 14–15; Docket Entry No. 19-2). "Polar Pro agreed that FrogSlayer could proceed working on the video editing program based on the estimate laid out in the Project

Charter." (Docket Entry No. 1 at ¶ 16). The charter summarized the project purpose and scope, noting that the goal is for "PolarPro customers [to] easily create video compositions and feel like they are using a 'pro level' piece of software." (Docket Entry No. 19-2 at 3). The charter specified that the project was not to create software that would "attempt to compete with Adobe Premier, FinalCut Pro and other professional level video editing applications." (*Id.* at 4). The charter also included a list of key processes, project requirements, and technical design elements. (*Id.* at 5–11). On January 25, 2018, FrogSlayer sent Polar Pro a "Roadmap" listing "the features the program would have." (Docket Entry No. 1 at ¶ 17).

On June 12, 2018, Polar Pro told FrogSlayer that "version one of The Ripper project was not close to working," even though "$235,000 had already been paid of the $262,520 cost estimate." (*Id.* at ¶ 19). On June 17, Ross Morel, FrogSlayer's Chief Executive Officer, admitted to Polar Pro that "hard facts" had not initially been "presented" and "sincerely apologize[d] for the delay." (*Id.* at ¶ 20). Morel stated that "version one . . . would most likely cost [an additional] $106,785 to complete with approximately eleven weeks of schedule remaining," as long as the scope and requested features were not changed, and that "FrogSlayer will agree to cover all costs exceeding our likely estimate [of $106,785]." (*Id.*). Relying on Morel's statements and estimate, Polar Pro instructed FrogSlayer to continue working on The Ripper, thanking FrogSlayer for "ensuring [Polar Pro's] cost to complete [version one] does not exceed: $106,785." (*Id.* at ¶ 21).

FrogSlayer sent Polar Pro an updated Roadmap on July 9, 2018. (*Id.* at ¶ 22). The updated Roadmap color-coded various features, indicating the features that would (green), could (yellow), and would not (red) be in version one. (*Id.* at ¶ 23). That same day, Jeff Overall, Polar Pro's Chief Executive Officer, demanded that many features in the yellow and red categories be in version one, and FrogSlayer agreed. (*Id.* at ¶¶ 23–24). On October 2, "FrogSlayer communicated to Polar

3

Pro that it would waive any further payments regarding its work on version one of The Ripper project because 'as per the agreement sent by Mr. Morel on June 18, 2019[,]' the $106,785 budget estimate had already been fulfilled and paid by Polar Pro." (*Id.* at ¶ 25 (alterations omitted)).

On January 18, 2019, Polar Pro asked FrogSlayer how the "performance (e.g.[,] speed)" of version one "would be judged." (*Id.* at ¶ 26). FrogSlayer responded on January 30, "for the first time since The Ripper project had been commenced," that OpenShot, a "free, open-source, video editing program" would be the benchmark. (*Id.* at ¶ 27). Polar Pro responded that this program "was not a viable product or benchmark to The Ripper Project." (*Id.* at ¶ 28). In Polar Pro's view, "iMovie and DaVinci Resolve" were the proper benchmarks, and FrogSlayer agreed. (*Id.* at ¶ 29).

In February 2019, FrogSlayer "refused to perform any further work on The Ripper project without additional pay—contrary to its June 17, 2018 communication." (*Id.* at ¶ 30). FrogSlayer told Polar Pro that the "additional costs necessary to complete version one of The Ripper Project would be another $210,000–$390,000 and an additional six to nine months of work." (*Id.*). Morel told Polar Pro that FrogSlayer "had 'failed to navigate the risks upfront'" and that "mistakes were made early-on in the project." (*Id.* (alterations omitted)). According to the complaint:

> The last version one demo of The Ripper Project provided to Polar Pro fails to provide nearly every feature in the 'in scope' section of the Roadmap and also fails to provide most of the features in the 'maybe in scope' section of the Roadmap. The last version one demo of the Ripper Project failed to meet the requirements and functionalities set out by the Roadmap. The last version one demo runs at a slower rate than industry standards and also crashes when certain functions are activated. . . .
>
> The last version one demo of The Ripper Project has no commercial value and there is no market in which Polar Pro can sell a defective software program to recoup any cost. It cannot be sold to customers and would not even be able to be given away due to its speed, the program crashing and lack of functionalities. Polar Pro has received nothing viable in return for its payments made to FrogSlayer.

(*Id.* at ¶¶ 31–32). FrogSlayer urges the court to dismiss the complaint allegations with prejudice as inadequate to allege breach of contract and fraud. (Docket Entry No. 19 at 4–5). The allegations are analyzed under the applicable legal standard.

## II. The Legal Standard

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). A complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556).

The court should generally give a plaintiff at least one chance to amend under Rule 15(a) before dismissing the action with prejudice, unless it is clear that to do so would be futile. *See Pervasive Software Inc. v. Lexware GmbH & Co. KG*, 688 F.3d 214, 232 (5th Cir. 2012); *Carroll v. Fort James Corp.*, 470 F.3d 1171, 1175 (5th Cir. 2006) ("[Rule 15(a)] evinces a bias in favor of granting leave to amend." (quotation omitted)); *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002). "Whether leave to amend should be granted is

entrusted to the sound discretion of the district court." *Pervasive Software*, 688 F.3d at 232 (quotation omitted).

"On a Rule 12(b)(6) motion, a district court generally must limit itself to the contents of the pleadings, including attachments." *Brand Coupon*, 748 F.3d at 635 (quotation omitted). "The court may also consider documents attached to either a motion to dismiss or an opposition to that motion when the documents are referred to in the pleadings and are central to a plaintiff's claims." *Id.*; *see, e.g.*, *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) ("[B]ecause the defendants attached the contracts to their motions to dismiss, the contracts were referred to in the complaints, and the contracts are central to the plaintiffs' claims, we may consider the terms of the contracts in assessing the motions to dismiss."). A district court errs by considering evidence "outside the pleadings—and not referred to therein—without converting the motion to dismiss into a motion for summary judgment." *Brand Coupon*, 748 F.3d at 635; *see also Katrina Canal Breaches*, 495 F.3d at 205 ("Generally, in deciding a motion to dismiss for failure to state a claim, if matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment." (quotation omitted)); *Isquith for and on Behalf of Isquith v. Middle S. Utils., Inc.*, 847 F.2d 186, 196 (5th Cir. 1988) ("[W]hen non-pleading materials are filed with a motion to dismiss, . . . a district court has complete discretion under the Federal Rules of Civil Procedure to either accept the exhibits submitted or not, as it sees fit.").

### III. Analysis

#### A. Timeliness

Polar Pro opposes FrogSlayer's motion to dismiss, arguing that because FrogSlayer "did not join its Rule 12(b)(6) grounds with its previous Rule 12(e) motion, nor raise[] them through a

Rule 7(a) pleading, Rule 12(g)(2) precludes FrogSlayer's [m]otion in its entirety." (Docket Entry No. 22 at 5).

In response to Polar Pro's complaint, FrogSlayer first moved for a more definite statement under Rule 12(e). (Docket Entry No. 11). The court denied the motion, finding the complaint intelligible and capable of providing sufficient notice of the claims for FrogSlayer to answer. (Docket Entry No. 14). FrogSlayer then moved to dismiss Polar Pro's complaint for failure to state a claim under Rule 12(b)(6). (Docket Entry No. 19). FrogSlayer argues that Rule 12(g)(2) does not preclude its current motion because the defense was not available when it filed its Rule 12(e) motion. (Docket Entry No. 23 at 3). FrogSlayer alleges that it was previously "unsure as to what Polar Pro's [c]omplaint was alleging, much less what responsive filings were available to it." (*Id.*).

Rule 12(g)(2) states that "[e]xcept as provided in Rule 12(h)(2) or (3), a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion." FED. R. CIV. P. 12(g)(2). Rule 12(h)(2) provides an exception, allowing failure to state a claim to be raised: "(A) in any pleading allowed or ordered under Rule 7(a); (B) by a motion under Rule 12(c); or (C) at trial." FED. R. CIV. P. 12(h)(2). None of Rule 12(h)(2)'s exceptions apply in this case.

In *Doe v. Columbia-Brazoria Indep. Sch. Dist.*, 855 F.3d 681, 686 (5th Cir. 2017), the Fifth Circuit held that Rule 12(h)(2) allowed the filing of a second motion to dismiss, raising the defense of failure to state a claim, after the defendant's original motion to dismiss was denied. *Id.* The court explained that "even if Rule 12(h)(2) should not be interpreted this way, there [is] no harm in allowing the second motion," when the defendant could have brought the argument the second motion presented in a Rule 12(c) motion for judgment on the pleadings. *Id.*

7

This case presents a similar situation. FrogSlayer could raise its argument that Polar Pro failed to state a claim in a Rule 12(c) motion. FrogSlayer's motion to dismiss is not precluded from review.

### B. The Breach of Contract Claim

FrogSlayer argues that Polar Pro's breach of contract claim is facially implausible because Polar Pro misunderstands the contract and FrogSlayer's representations about the work it would perform. (Docket Entry No. 19 at 10–11). Polar Pro responds that FrogSlayer's arguments are "untenable," and that taking Polar Pro's factual allegations as true, the complaint allows the court "to draw a reasonable inference that FrogSlayer is liable for the misconduct alleged." (Docket Entry No. 22 at 8–11).

Under Texas law, the elements of a breach of contract claim are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach. *Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Ga., Inc.*, 892 F.3d 719, 731 (5th Cir. 2018).

Polar Pro has alleged each element of a breach of contract claim. The parties agree that in October 2017, they entered into a valid contract, the Software Consulting Agreement, under which FrogSlayer agreed to provide consulting and software development services. (Docket Entry No. 1 at ¶ 13; Docket Entry No. 19 at 5). Polar Pro alleges that it performed under the Agreement by paying the initial $262,520 cost estimate and an additional $106,785, but that FrogSlayer breached by failing to develop a viable software program, causing harm. (*Id.* at ¶¶ 39–40). These allegations state a plausible claim for breach of contract under Texas law.

FrogSlayer argues that Polar Pro's complaint is facially implausible because the parties "operated upon the agreement that FrogSlayer would use OpenShot's open-source code to develop an MVP-version of the Ripper *and* that the Ripper was *not* going to be benchmarked/compete against professional video-editing software programs." (Docket Entry No. 19 at 10). Polar Pro responds that FrogSlayer was supposed to use the OpenShot video library to create a program separate from the OpenShot video editor. (Docket Entry No. 22 at 2–3). FrogSlayer replies that Polar Pro "confuses its misunderstanding of what [OpenShot video library] is and how FrogSlayer utilized its resources with an alleged breach of contract." (Docket Entry No. 23 at 4). FrogSlayer attached the Agreement and the December 2017 project charter to its motion to dismiss. (Docket Entry Nos. 19-1, 19-2). The only mention of OpenShot is in section 5.4, which discusses the OpenShot video library as the "best candidate" for the "cross-platform video and audio manipulation libraries" used by the Ripper. (Docket Entry No. 19-2 at 10).

The court accepts Polar Pro's well-pleaded facts as true, and views them in the light most favorable to Polar Pro. *See Katrina Canal Breaches*, 495 F.3d at 205. But even assuming that FrogSlayer correctly describes OpenShot's role in the project, Polar Pro has stated a plausible breach of contract claim. Polar Pro alleges that FrogSlayer did not create a viable program with the agreed functionalities, and that the version one demo "runs at a slower rate than industry standards and also crashes when certain functions are activated." (Docket Entry No. 1 at ¶ 31). Polar Pro reiterates this claim in its response, stating that the demo failed to include many of the functionalities required in the project charter. (Docket Entry No. 22 at 10). Neither the Agreement nor the project charter mentions that using the OpenShot video editor excuses FrogSlayer's failures in performance.

FrogSlayer also argues that Polar Pro's complaint is facially implausible because Polar Pro admits that it asked to change the Agreement's scope by "demanding that the Ripper be benchmarked/compete against professional video-editing software." (Docket Entry No. 19 at 10). Polar Pro responds that it asked FrogSlayer to benchmark the program's speed to that of programs such as iMovie, which Polar Pro characterizes as a "recreational," not a professional, program. (Docket Entry No. 22 at 9). Even if the court took FrogSlayer's allegations as true, FrogSlayer does not explain how these facts would relieve it of its obligation to provide a viable product under the Agreement.

Polar Pro has stated a plausible claim for contract breach.

C. **The Fraud-Based Claims**

FrogSlayer similarly argues that Polar Pro's fraud, negligent misrepresentation, and Deceptive Trade Practices Act claims are facially implausible because they are based on a misunderstanding of the Agreement's scope and what FrogSlayer represented it would provide, and that Polar Pro's allegations fail to meet Rule 9(b)'s heightened pleading standard. (Docket Entry No. 19 at 11–12).

In a federal court, fraud allegations "must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED. R. CIV. P. 9(b). To satisfy Rule 9(b), a plaintiff must "state the who, what, when, where, and how of the alleged fraud." *Musket Corp. v. Suncor Energy (U.S.A.) Mktg., Inc.*, 759 F. App'x 280, 286 (5th Cir. 2019) (quoting *United States ex rel. Stephenson v. Archer W. Contractors, L.L.C.*, 548 F. App'x 135, 139 (5th Cir. 2013)). The Fifth Circuit has explained that the standard requires "a plaintiff to plead the time, place and contents of the false representation, as well as the identity of the person making the misrepresentation and what that

person obtained thereby." *Id.* (quoting *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 186 (5th Cir. 2009)).

Rule 9(b) governs negligent misrepresentation when, as here, the plaintiff's "fraud and negligent misrepresentation claims are based on the same set of alleged facts." *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 723 (5th Cir. 2003). Rule 9(b) also governs Deceptive Trade Practices Act claims that "depend on the same set of facts that support a fraud claim." *Abbey on Preston H.O.A. v. Admiral Ins. Co.*, No. 13-CV-102-N, 2013 WL 12137742, at *2 (N.D. Tex. July 29, 2013); *see Ranzy v. Extra Cash of Tex., Inc.*, No. 9-334, 2011 WL 6719881, at *5 (S.D. Tex. Dec. 21, 2011) ("There are cases that have applied Rule 9(b)'s heightened specificity requirements to claims under the DTPA, but in those cases the underlying claims involved fraud."); *Berry v. Indianapolis Life Ins. Co.*, 608 F. Supp. 2d 785, 800 (N.D. Tex. 2009) ("It is well-established that 'claims alleging violations of the DTPA are subject to the requirements of Rule 9(b).'" (alteration omitted) (quoting *Patel v. Holiday Hosp. Franchising, Inc.*, 172 F. Supp. 2d 821, 824–25 (N.D. Tex. 2001))).

Polar Pro alleges that FrogSlayer made fraudulent statements before the Agreement was executed, during development, and after FrogSlayer admitted that the project was delayed. (Docket Entry No. 22 at 12). Polar Pro's claims are based on three statements: (1) on August 29, 2017, FrogSlayer stated that it had done preliminary market research on the project and could complete the project based on its team's experience, (Docket Entry No. 1 at ¶ 10); (2) on January 25, 2018, FrogSlayer emailed Polar Pro the Roadmap, detailing the features the program would have, (*id.* at ¶ 17); and (3) on June 17, 2018, FrogSlayer's CEO, Ross Morel, emailed Polar Pro, stating that "hard facts were not presented" to Polar Pro and that FrogSlayer would need more time and money to complete the project as currently envisioned, (*id.* at ¶ 20).

11

Polar Pro's allegations about FrogSlayer's description of its capabilities, made before the parties signed the Agreement, and about the project's proposed features do not meet the Rule 9(b) heightened pleading standard. Polar Pro has not identified who made the alleged statements and, for the first one, how it was communicated. Only the allegation that Morel asked for more time and money satisfies Rule 9(b). Polar Pro has identified the "who, what, when, where, and how" of the alleged fraud, negligent misrepresentation, and Deceptive Trade Practices Act violations based on this statement.

FrogSlayer argues that Polar Pro "does not categorize FrogSlayer's representation that it would cover all costs after reaching the [o]verage [amount] as a fraudulent representation" because Polar Pro admits that on October 2, 2018, FrogSlayer waived any further payment for its work on the Ripper. (Docket Entry No. 19 at 12). But Polar Pro alleges that on February 21, 2019, FrogSlayer refused to perform any more work to complete version one without additional pay, and that Morel made the earlier representations "with the intent that Polar Pro" pay the overage amount. (Docket Entry No. 1 at ¶¶ 30, 60). In its allegation of negligent misrepresentation, Polar Pro characterizes Morel's statements as "false information." (*Id.* at ¶ 43).

FrogSlayer also argues that the complaint "is void of any explanation as to what Polar Pro believes FrogSlayer omitted or how the [o]mission was fraudulent." (Docket Entry No. 19 at 13). But the details of what Morel meant are not required. The allegation that on June 17, 2018, Morel stated via email that FrogSlayer would complete the project with more time and money is sufficient to state a claim for fraud, even without the allegation that Morel admitted to previously withholding information from Polar Pro. Taking Polar Pro's factual allegations as true, Morel's alleged statement states a fraud claim that meets Rule 9(b).

12

FrogSlayer's motion to dismiss the claims based on Morel's statement is denied. The motion is granted for the claims based on the statements made before the parties signed the Agreement, and later, about the program functionalities. FrogSlayer argues that these claims should be dismissed with prejudice because amendment would be futile. (Docket Entry No. 19 at 14–15). The argument is that the claims rely "on the groundless presumption that FrogSlayer represented that it had the ability to develop and would deliver a video editing software program that would compete with professional programs." (*Id.* at 13–14). But, as discussed, Polar Pro disputes FrogSlayer's claim that it simply misunderstands the Agreement and therefore what FrogSlayer said, and factual disputes must be resolved in Polar Pro's favor. The court cannot say that amendment to comply with Rule 9(b)'s heightened pleading standard would be futile.

## III. Conclusion

FrogSlayer's motion to dismiss is granted in part for the fraud-based claims relating to the statements made before the Agreement about FrogSlayer's capabilities, and after the Agreement, about the project's functionalities, and denied in part for the fraud-based claims relating to Morel's statement and the breach of contract claim. Polar Pro may amend, no later than **November 11, 2019**.

SIGNED on October 22, 2019, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge